UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TIMOTHY KOSTKA,

     *Plaintiff,*

v.

MICHAEL RODRIGUES,

     *Respondent.*

No. 23-cv-11428-RGS

### REPORT AND RECOMMENDATION

LEVENSON, U.S.M.J.

### INTRODUCTION

Petitioner, Timothy Kostka, who is in the custody of the Commonwealth of Massachusetts, seeks a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Docket No. 1.

In October 2015, a Massachusetts jury convicted Petitioner of murder in connection with the stabbing of Barbara Coyne during a home invasion. The jury found Petitioner guilty of murder in the first degree, on theories of deliberate premeditation and extreme atrocity or cruelty, and of home invasion. After review by the Supreme Judicial Court of Massachusetts ("SJC"), Petitioner stands convicted of murder in the first degree. The SJC affirmed Petitioner's conviction in all respects and denied his motion for a new trial. *See Commonwealth v. Kostka*, 489 Mass. 399 (2022).

Judge Stearns has referred the habeas petition to me for report and recommendation. Docket No. 12. Petitioner filed a memorandum of law in support of the habeas petition. Docket No. 13. The Commonwealth filed an opposition. Docket No. 14. On July 8, 2024, I held a hearing and heard argument from the parties. Docket No. 16.

In challenging the constitutionality of his conviction and confinement, Petitioner contests two determinations by the SJC:

- First, the SJC found no violation of Petitioner's due process rights in the admission of written evidence and testimony about lottery tickets linking Petitioner to the crime. Petitioner contends that, because those materials had not been disclosed in pretrial discovery, their introduction at trial violated his due process right to a fair trial under the Fifth and Fourteenth Amendments.

- Second, the SJC rejected Petitioner's contention that the prosecutor's closing argument with respect to the lottery ticket evidence—including the prosecutor's remark that defense counsel was engaging in "gamesmanship"—was improper. Petitioner contends that these remarks violated his due process rights.

For the reasons detailed below, I recommend DENYING the habeas petition.

## I.    Factual Background

### A.    The Murder

The murder and home invasion charges at issue here arose from the stabbing of Barbara Coyne, a 67-year-old grandmother, at her home in South Boston on April 16, 2012.

All of the arguments in this habeas petition relate to evidence about lottery tickets linking Petitioner to the crime. Accordingly, I will focus on that evidence and will not detail the other evidence of the crime, which is described in the SJC's opinion. *See Kostka*, 489 Mass. at 400–04.

The Commonwealth's theory at trial was that Petitioner, a heroin addict who broke into houses to support his addiction, committed the home invasion and murder. The Commonwealth presented testimony from a witness who testified that Petitioner had told him "that if anyone caught [Petitioner] breaking into a house, he would 'slice their throat.'" *Id.* at 401. The prosecution also introduced "fingerprint evidence tying [Petitioner] to jewelry boxes in the victim's bedroom and a bloody envelope in her living room. He also was a possible contributor to DNA found under the victim's fingernails." *Id.* at 418.

A significant component of the Commonwealth's case focused on lottery tickets: namely scratch tickets that were found in the victim's home and others that were cashed shortly after the murder. The prosecution's theory was that Petitioner stole winning lottery tickets from the victim's apartment, while leaving losing tickets behind.

To support this theory, the Commonwealth offered testimony from the victim's granddaughter, who explained "that her grandmother frequently played scratch lottery tickets and tended to keep ten to fifteen in the apartment at any one time, on a footstool in her living room." *Id.* at 402. Moreover, at the crime scene, "[p]olice found lottery tickets in the living room, in the kitchen, and inside the victim's vehicle; the tickets in the living room were stained with what appeared to be blood." *Id.* According to prosecutors, shortly after the murder, one hundred dollars' worth of winning scratch tickets were cashed at a convenience store several blocks from the victim's apartment. Some were cashed roughly 15 minutes after the murder,[1] and others were cashed about two hours later. *Id.* at 402–03. Security camera footage from the convenience store showed that Petitioner was present in the store both times the lottery tickets were cashed. *Id.* About an hour after the last tickets were cashed, Petitioner and a friend drove to another neighborhood to buy heroin. *Id.* at 402.

The incriminating inference from the lottery ticket evidence was that Petitioner stole the winning lottery tickets from the victim's apartment in the course of the home invasion that led to the fatal stabbing. Critical to this inference was the prosecution's evidence that the winning tickets cashed at the convenience store were in close numerical sequence with the losing tickets

---

[1] The victim's adult son, who lived in a different apartment in the same three-decker building, spoke with her at 9:47 or 9:48 a.m. and, approximately 10 to 15 minutes later, discovered her lying on floor in her apartment, stabbed in the throat but still alive. She died in the ambulance. *Kostka*, 489 Mass. at 401.

found in the victim's apartment. Lottery tickets are sold in "books" of tickets that are in numerical sequence, so the prosecution's evidence suggested that the cashed tickets had been purchased together with the losing tickets. As the SJC noted, "the unique combination of book number, game number, and sequential ticket number were described clearly at trial, and the winning ticket numbers at issue were very close in numbered sequence to tickets from the same game and book found in the victim's home." *Id.* at 418.

The SJC reviewed the trial evidence concerning the lottery tickets at some length. As discussed in the SJC's opinion, the prosecution offered testimony from Kevin Carroll, a security investigator for the Massachusetts Lottery Commission, who described the business practices associated with lottery ticket sales and redemption and explained the documentary evidence. Mr. Carroll testified that lottery tickets are ordered by the Massachusetts Lottery Commission, manufactured by a private vendor, distributed to authorized sellers known as "agents" (such as the convenience store in this case), and cashed by such agents. *Id.* at 402–04, 406–09. Winning lottery tickets are destroyed as a matter of routine practice, so the prosecutor relied on electronic records—including summaries of business records—to identify the book number, game number, and sequential ticket number of the now-destroyed winning tickets that were cashed when Petitioner was in the convenience store.

### B.    *Discovery, Trial Presentation, and Argument Regarding Lottery Tickets*

Petitioner's habeas claims turn on the timing and completeness of the prosecution's production of documents regarding the lottery tickets and on the prosecutor's closing argument to the jury about those lottery tickets. Accordingly, a review of pertinent portions of the record is in order.

1.  *Pretrial Discovery*

Two sets of documents regarding the lottery tickets were produced by the prosecution during pretrial discovery, approximately two years before trial. One set consisted of "daily business reports" from the convenience store where the winning tickets were cashed; the other set consisted of "reconstruction reports" from the manufacturer of the tickets. *See Kostka*, 489 Mass. at 406. For present purposes, the key points about these two sets are:

- Neither set listed sequential ticket numbers for the tickets that were cashed about 15 minutes after the murder;

- Both sets showed sequential ticket numbers for the tickets that were cashed about two hours after the murder;

- The "daily business report" included ticket numbers that had plainly been manually added from the "reconstruction reports";

- Each set of documents listed an additional number for each ticket, a so-called "void if removed number" ("VIRN"); and

- The VIRNs listed for each ticket did not match between the two sets.

*See id.* at 402–09.

2.  *Trial Evidence and the JFI Report*

During trial, prosecutors produced to the defense a third set of lottery ticket evidence, referred to as the "JFI Report." A few days later, the prosecutors introduced the JFI Report in evidence.

The JFI Report had been generated by the Lottery Commission only two days before it was disclosed to Petitioner. Petitioner objected to the late disclosure of the JFI Report, but the trial judge conducted a voir dire and ultimately permitted the Commonwealth to introduce it. *See id*. at 406–07. The JFI Report differed from the first two sets of lottery ticket documents that had been produced ahead of trial in that:

- The JFI Report reflected individual ticket numbers for *all* tickets that the prosecution identified as having been cashed when Petitioner was in the convenience store (*i.e.*, those cashed within 15 minutes of the murder and those cashed about two hours after the murder);

- The JFI Report reflected a VIRN for each ticket;

- The VIRNs listed in the JFI Report did not match the VIRNs in either of the previously produced sets.

*See id.* at 407. As Petitioner points out, by addressing the lacuna in the Commonwealth's case with respect to sequential ticket numbers for the tickets that were cashed immediately after the murder, the JFI Report was highly incriminating:

> [T]he materials produced mid-trial now included a purported ticket number for each transaction, allowing the Commonwealth to fill a significant gap in its proof. Specifically, the Commonwealth was able to show that the tickets cashed at 10:02 a.m. were sequentially related to losing ticket numbers found at the home of the victim, a fact that it could not have proved with the documents produced in discovery, assuming they had been admissible in evidence.

Docket No. 13, at 20–21 (citation omitted).   Petitioner also points out that the JFI Report, unlike the "daily business report," was in a uniform typeface (whereas the "daily business report" plainly showed data that had been added at various times). *Id.* at 21. Moreover, Petitioner notes, the JFI Report showed that there were now three (not two) sets of non-matching VIRNs for the winning tickets. *See id.*

At trial, Petitioner did not move for a continuance or otherwise seek additional time to respond to the JFI Report. *Kostka*, 489 Mass. at 412. Instead, Petitioner introduced in evidence the other two sets of lottery ticket documents (*i.e.*, the ones that had been produced pre-trial). *Id.* at 408. In cross-examining Mr. Carroll, the Lottery Commission investigator, Petitioner's trial counsel focused on apparent discrepancies between the three sets of documents, emphasizing the

different VIRNs in each set.[2] *Id.* Responding to defense counsel's questions, Mr. Carroll testified

that his "computer people" had explained to him that the VIRNs differed in the various reports

because they are "encrypted by the computer somehow." *Id.* at 409. This was, presumably,

inadmissible hearsay, although there was no contemporaneous objection, and the defense did not

ask the trial judge to strike the answer. *Id.* at 417.

3. *Closing Arguments*

During closing arguments, the prosecutor told the jury that they could rely on the Lottery

Commission records and that the defense's emphasis on the differences in the VIRNs was

"gamesmanship." *Id.* at 415. Pointing to the testimony of Mr. Carroll, the prosecutor argued that

"the VIRNs don't match up . . . because they are encrypted." *Id.* The prosecutor's argument was

as follows:

> And as regards to the lottery ticket records, ask yourselves, ladies and gentlemen,
> whether you can rely on the records of the Massachusetts State Lottery
> Commission, a billion dollar business, and as you recall from the testimony, ask
> yourselves whether truly the numbers do not match or whether there was some
> gamesmanship in the numbers playing by the defense, because what you know
> through the testimony of Mr. Carroll is that the reason those VIRN's don't match
> up is because they are encrypted.

Docket No. 8-14, at 87:8–19.

## II. Procedural Background

Following the verdict and sentencing, Petitioner filed a timely notice of appeal. *Kostka*,

489 Mass. at 404.

In November 2018, while his appeal was pending before the SJC, Petitioner filed a

motion for a new trial, which the SJC remanded for consideration by the Superior Court. *Id.*

---

[2] As discussed below, Petitioner later argued in closing that the discrepancies between the
VIRNs meant that the lottery ticket evidence could not be trusted, thereby attempting to cast
doubt on the prosecution's theory of the case. *Kostka*, 489 Mass. at 416**.**

Petitioner also filed in the Superior Court a motion for posttrial discovery concerning the JFI Report. *Id.* The trial judge held a hearing and denied both motions. *Id.*

Petitioner appealed the denial of his motion for a new trial, and the SJC consolidated that appeal with the direct appeal from the underlying conviction. *Id.* In his direct appeal and in his motion for a new trial, Petitioner raised arguments regarding the mid-trial disclosure of the JFI Report, as well as claims of improper closing arguments by the prosecution. *See* Docket No. 8, SA 026–36, 041–45, 087–104.[3] Petitioner contended that the prosecution had violated his due process rights, invoking both *Brady v. Maryland* and Rule 14 of the Massachusetts Rules of Criminal Procedure. *See id.*

On October 8, 2021, the SJC heard argument from the parties. On March 31, 2022, the SJC affirmed Petitioner's conviction, as well as the trial judge's denial of Petitioner's motion for a new trial. *Kostka*, 489 Mass at 420.

## III.    AEDPA Standard of Review for Habeas Cases

The authority of federal courts to grant habeas relief for persons in state custody is governed, in the first instance, by 28 U.S.C. § 2254(d), which was added to Section 2254 as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

As the Supreme Court has emphasized, under AEDPA, the aperture through which federal courts may view challenges to state court convictions is a narrow one:

> When Congress supplies a constitutionally valid rule of decision, federal courts must follow it. In AEDPA, Congress announced such a rule. It instructed that a federal court "*shall not . . . gran*[*t*]" relief with respect to a claim that has been adjudicated on the merits in state court "*unless*" the state court's decision was (1) "contrary to" or an "unreasonable application of" clearly established federal law, as determined by the decisions of this Court, or (2) based on an "unreasonable

---

[3] Citations to the Supplemental Answer (Docket No. 8) refer to the page number of the document as filed. Such page number is reflected at the bottom of the page (*e.g.*, SA 026).

determination of the facts" presented in the state-court proceeding. § 2254(d) (emphasis added).

*Brown v. Davenport*, 596 U.S. 118, 127 (2022) (alteration in original); *see also Foxworth v. St. Amand*, 570 F.3d 414, 424 (1st Cir. 2009).

Thus, review in this Court is limited to determining whether the SJC's decision was "contrary to" or an "unreasonable application of" Supreme Court precedent. As the First Circuit has noted,

> A state court decision is "contrary to" the Supreme Court's clearly established precedents if it either applies a rule that contradicts the governing law or resolves a case differently from the Court on materially indistinguishable facts. A state court decision is "an unreasonable application" of Supreme Court case law only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

*Zuluaga v. Spencer*, 585 F.3d 27, 30 (1st Cir. 2009) (citation omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).

In other words, this Court is required to recognize that the SJC, like every state's highest court, is independently empowered to interpret the United States Constitution. Habeas relief is not available merely because this Court might favor a different view of the law; such relief is only available for indefensible interpretations. As the Supreme Court has noted, AEDPA prohibits habeas relief unless the petitioner can "persuade a federal court that no 'fairminded jurist' could reach the state court's conclusion under [the Supreme Court's] precedents." *Davenport*, 596 U.S. at 135 (first alteration in original) (quoting *Davis v. Ayala*, 576 U.S. 257, 269–70 (2015)).

Importantly for this case, only the Supreme Court's precedents—not the decisions of any lower federal court—figure in the AEDPA analysis. As the First Circuit has noted, "[i]f the federal law is not clearly established by the United States Supreme Court, then per force the state

court decision cannot be either contrary to or an unreasonable application of clearly established federal law." *Likely v. Ruane*, 642 F.3d 99, 102 (1st Cir. 2011); *see also Glebe v. Frost*, 574 U.S. 21, 24 (2014) ("As we have repeatedly emphasized[] . . . circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" (quoting 28 U.S.C. § 2254(d)(1))). Thus, in considering a habeas petition that seeks relief from a state court conviction, the Court "must look for Supreme Court precedent that either 'squarely addresses the issue' in the case or that articulates legal principles that 'clearly extend' to the new factual context." *Brown v. Ruane*, 630 F.3d 62, 69 (1st Cir. 2011) (quoting *Wright v. Van Patten*, 552 U.S. 120, 123–125 (2008) (per curiam)); *see also Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam) (circuit precedent cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced").[4]

## IV.    Analysis

In the "Standard of Review" section of his brief, Petitioner dutifully recites the controlling standard under AEDPA.[5] Docket No. 13, at 8–10. But the remainder of his submission is devoid of reference to the AEDPA standard, let alone any cogent argument

---

[4] In addition to the AEDPA standard, a habeas petition is subject to the "actual prejudice" standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Davenport,* 596 U.S. at 127 ("[W]here *Brecht* is implicated a federal court must also ensure a habeas petitioner has carried his burden under its terms before granting relief."). There is, however, no contention in this case that the SJC failed to address the constitutional arguments that Petitioner now advances in this Court, and the Commonwealth concedes that the issues here were properly preserved and exhausted. Given that Petitioner's arguments fail under the AEDPA standard, there is no occasion in this case to consider "actual prejudice" under *Brecht.*

[5] Petitioner cites *Cooper-Smith v. Palmateer*, 397 F.3d 1236 (9th Cir. 2005), for the proposition that "[w]here the state court has applied the wrong standard in addressing a federal constitutional claim, the habeas court can address the claim *de novo.*" Docket No. 13, at 9. This is something of a non sequitur, since Petitioner makes no claim that the SJC missed the issues he raises or otherwise failed to adjudicate them on the merits.

addressing it. In advancing each of his due process arguments, Petitioner fails to even suggest that the SJC's rejection of his constitutional claims is in conflict with any decision of the United States Supreme Court.[6] Yet this is what Petitioner must demonstrate in order to prevail. As discussed below, Petitioner's failure to meet this standard is fatal to both of the arguments he advances in this Court.

### A.    Midtrial Disclosure and Introduction of Lottery Ticket Evidence

Petitioner argues that the JFI Report contained new evidence that was "highly inculpatory" and that "its introduction mid-trial unfairly ambushed the defense." Docket No. 13, at 25 (citing *Lindsey v. Smith*, 820 F.2d 1137, 1151 (11th Cir. 1987)). On this basis, Petitioner contends that "late disclosure" of the JFI reports "deprived [him] of his right to due process as guaranteed by the Fifth and Fourteenth Amendments." *Id.* at 27 (citing *United States v. Liburd*, 607 F.3d 339, 346 (3rd Cir. 2010)).

The unspoken assumption of Petitioner's "ambush" theory is that the due process clauses of the United States Constitution require that he be given advance notice of the "highly inculpatory" evidence that was introduced against him. This assumption, however, is mistaken. Whatever rights may be afforded under the discovery requirements of the Massachusetts Rules of Criminal Procedure, there is no general federal constitutional right to discovery in criminal cases.

---

[6] In this Court, the Commonwealth has conceded that Petitioner preserved and exhausted his state court remedies with respect to the due process claims that Petitioner raises in the present habeas petition. Thus, even though the SJC's opinion in this case focuses on Massachusetts law, it necessarily rejected Petitioner's federal constitutional claims. As the Supreme Court has noted, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication of state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

The Supreme Court has rejected, in the habeas context of another defendant convicted of murder, that "due process requires that he receive more than a day's notice of the Commonwealth's evidence." *Gray v. Netherland*, 518 U.S. 152, 167 (1996). As the Supreme Court noted in that case:

> A defendant's right to notice of the charges against which he must defend is well established. *In re Ruffalo*, 390 U.S. 544, 88 S. Ct. 1222, 20 L.Ed.2d 117 (1968); *Cole v. Arkansas,* 333 U.S. 196, 68 S. Ct. 514, 92 L. Ed. 644 (1948). But a defendant's claim that he has a right to notice of the *evidence* that the state plans to use to prove the charges stands on quite a different footing. We have said that "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded." *Wardius v. Oregon,* 412 U.S. 470, 474, 93 S. Ct. 2208, 2212, 37 L. Ed. 2d 82 (1973).

*Id.* at 167–68.

### 1.    *Petitioner Fails to Identity any Conflict with Supreme Court Precedent*

Under AEDPA, Petitioner can only prevail if he shows that the SJC's decision conflicts with a controlling decision of the United States Supreme Court. Yet the only cases Petitioner cites in support of his argument are circuit court decisions. This by itself is fatal to Petitioner's claim. *See Likely*, 642 F.3d at 102 ("If the federal law is not clearly established by the United States Supreme Court, then per force the state court decision cannot be either contrary to or an unreasonable application of clearly established federal law."); *see also Brown*, 630 F.3d at 68 ("A threshold determination that no holding of the Supreme Court required application to the factual context presented by the petitioner's claim is dispositive in the habeas analysis.").

Petitioner does not cite any Supreme Court precedent in his brief to support his argument concerning the JFI report. Nor, for that matter, does Petitioner even address the weight of authority from the Supreme Court that contradicts his arguments. Instead, Petitioner relies exclusively on two court of appeals cases: *Lindsey v. Smith,* 820 F.2d 1137, 1151 (11th Cir.

1987), and *United States v. Liburd*, 607 F.3d 339, 346 (3rd Cir. 2010). *See* Docket No. 13, at 25, 27. Neither, however, actually supports his arguments.

It is true that in *Lindsey*, the Eleventh Circuit indicated that it might, under appropriate circumstances, entertain a due process claim based on a prosecutor's failure to disclose incriminating evidence. *See* 820 F.2d at 1151 ("[U]nder certain circumstances the late disclosure even of inculpatory evidence could render a trial so fundamentally unfair as to violate due process."). Petitioner omits to mention, however, that the *Lindsey* court declined to make any such finding, since the prisoner in that case had failed to show that earlier disclosure of the evidence would have made a difference at trial. [7] *See id.* ("[A]lthough appellant argues that the confession had a 'devastating effect' on his defense, he fails to show how advance knowledge that it would be introduced could have made the evidence any less devastating."). The same logic forecloses Petitioner's claim in this case—nowhere in his submission does Petitioner even indicate that that his counsel could have done anything differently with more advanced notice of the JFI Report.

Petitioner's citation of *Liburd* is even farther off the mark. In a direct (*i.e.*, non-habeas) appeal,[8] the Third Circuit ruled that a new trial was warranted where the prosecution had abrogated an explicit promise that it would not introduce the defendant's statements at trial. *See*

---

[7] Notably, *Lindsey* is a pre-AEDPA habeas case. Pre-AEDPA, the Eleventh Circuit was not necessarily required to address the absence of any Supreme Court authority to support the dicta on which Petitioner now relies.

[8] That *Liburd* involved a direct appeal is significant because, in such cases, a court of appeals exercises supervisory authority, which does not come into play in habeas cases. *See generally Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) ("[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941))).

*Liburd*, 607 F.3d at 342 ("Liburd argues that [the prosecutor's] use of [Liburd's statement] at trial was misconduct because it violated [the prosecutor's] promises not to introduce evidence of anything Liburd said at the airport. We agree."). That such prosecutorial misconduct warranted remand for a new trial (from a court with plenary supervisory authority) has no bearing on this case, in which there is no claim of prosecutorial misconduct with respect to the disclosure of the JFI Report.

> 2.    *The SJC Properly Rejected Petitioner's Brady Claim*

In a perfunctory aside, Petitioner obliquely invokes *Brady v. Maryland* and its progeny. *See* Docket No. 13, at 24. It is hard to imagine a less persuasive way to raise an argument than Petitioner's unelaborated comment that "[t]here was therefore room to argue that the Commonwealth failed to match the numbers and that the disclosures in discovery were actually exculpatory." *Id*.[9] For want of development, the point is likely waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived."). Leaving aside Petitioner's failure to develop the point, I will address the issue briefly:

There is indeed an "exculpatory" aspect to the JFI Report in that it featured VIRNs that differed from both prior sets. Discrepancies among the VIRNs were a centerpiece for Petitioner's argument at trial that the lottery ticket evidence was unreliable. Specifically, Petitioner argued,

---

[9] Petitioner more fully articulated a *Brady* argument with regard to the JFI Report before the state court. Petitioner's motion for new trial contended that the JFI Report contained "exculpatory evidence that was required by *Brady* to be provided BEFORE and not during trial." Docket No. 8, SA 034. The SJC acknowledged that Petitioner had raised a *Brady* issue as to the JFI Report, noting that "defendant argued that he was prejudiced because his trial 'was substantially affected . . . by multiple *Brady* violations[] . . . .'" *Kostka*, 489 Mass. at 405. The SJC, however, primarily addressed the JFI Report in the context of state discovery rules, finding that "the Commonwealth did not violate its discovery obligations in this case." *Id.* at 412.

both during trial and in his motion for a new trial, that differences between the JFI Report and the two other sets of lottery ticket documents amounted to exculpatory evidence. *See* Docket No. 8, SA 034 ("[T]he fact that the serial numbers in the Commonwealth's trial exhibit representing information belonging to a state agency and in the Commonwealth's possession, custody and control for the previous 3 1/2 years did not match two sets of records previously represented by the prosecution as official records of the state Lottery Commission was exculpatory evidence that was required by *Brady* to be provided BEFORE and not during trial . . . ."); Docket No. 8-17, at 15:15–17 ("It was indeed further exculpatory information and would have been used in an exculpatory fashion had we had it prior to the trial[] . . . .").

Even treating the JFI Report as exculpatory, Petitioner's *Brady* claim fails of its own weight, since it is undisputed that Petitioner's counsel received the JFI Report during trial. Indeed, Petitioner's trial counsel used the JFI Report as part of his cross-examination of the Lottery Commission investigator, Mr. Carroll.

Petitioner's entire argument with respect to the JFI Report rests on the *timing* of its production: the fact that it was provided during trial, rather than in pretrial discovery. Petitioner argues that, because of the mid-trial disclosure, trial counsel "had no ability to conduct further discovery"—such as deposing the investigator—and "no ability to cross-examine [the investigator] . . . as to the source" of the JFI Report. Docket No. 13, at 25.[10]

On habeas review, the timing of discovery is largely immaterial, as it does not implicate any federal constitutional right. Indeed, Petitioner's counsel conceded at argument that he is

---

[10] The record reflects that Petitioner's trial counsel received the JFI Report a day or so before Mr. Carroll, the Lottery Commission investigator, took the stand. At sidebar, the prosecutor noted that defense counsel had received the JFI Report, and that the investigator had been made available to speak with defense counsel, in advance of the investigator's testimony. *See* Docket No. 8-11, at 131:9–14.

unaware of any Supreme Court precedent establishing a federal constitutional right with respect

to the *timing* of disclosure of exculpatory evidence. Various state and federal laws and

procedural rules establish the rights of criminal defendants with respect to pretrial discovery of

exculpatory evidence. There is, however, no federally recognized constitutional right to pretrial

discovery. On this point, the Supreme Court has spoken unequivocally:

> There is no general constitutional right to discovery in a criminal case, and *Brady*
> did not create one; as the Court wrote recently, "the Due Process Clause has little
> to say regarding the amount of discovery which the parties must be afforded. . . ."

*Weatherford v. Bursey*, 429 U.S. 545, 559–60 (1977) (quoting *Wardius v. Oregon*, 412 U.S. 470,

474 (1973)).

In its decision, the SJC addressed, in considerable detail, Petitioner's contention that the

mid-trial disclosure of the JFI Report violated the applicable discovery rule, Rule 14 of the

Massachusetts Rules of Criminal Procedure. In rejecting Petitioner's claim, the SJC noted that

the JFI Report had been turned over promptly after the prosecutors received it. The SJC also

noted that "defense counsel could have requested a continuance to investigate the discrepancies

between the JFI report and the lottery records received during discovery." *Kostka*, 489 Mass. at

412. There is nothing exceptionable about the SJC's ruling, which comports with federal

analogs. *See Gray*, 518 U.S. at 169 (noting that defense counsel did not seek a continuance when

faced with unexpected evidence); *United States v. Osorio*, 929 F.2d 753, 758 (1st Cir. 1991)

("Generally, we have viewed the failure to ask for a continuance as an indication that defense

counsel was himself satisfied he had sufficient opportunity to use the evidence

advantageously."); *see also United States v. Mathur*, 624 F.3d 498, 506 (1st Cir. 2010) ("The

customary remedy for a *Brady* violation that surfaces mid-trial is a continuance and a

concomitant opportunity to analyze the new information and, if necessary, recall witnesses.").

16

The state law discovery rules and the concomitant legal standards that were applied by the SJC in this case are substantially more protective of criminal defendants' rights than the due process protections of the Fifth and Fourteenth Amendments. *See Commonwealth v. Tucceri*, 412 Mass. 401, 413 & n.11 (1992) (noting that the Massachusetts common law standard for reviewing prejudice caused by "undisclosed evidence" is "more favorable to defendants than the Federal Constitutional standard"); *see also Kostka*, 489 Mass. at 410 ("Rule 14 was adopted to facilitate automatic provision of the discovery mandated by the constitutional principles set forth in *Brady*, 'without the need for motions or argument.'" (citation omitted) (quoting *Commonwealth v. Taylor*, 469 Mass. 516, 521 (2014))). Accordingly, the SJC's rejection of Petitioner's discovery arguments necessarily disposed of Petitioner's federal constitutional claims. *Cf. McCambridge v. Hall*, 303 F.3d 24, 35 (1st Cir. 2002) ("If there is a federal or state case that explicitly says that the state adheres to a standard that is more favorable to defendants than the federal standard (and it is correct in its characterization of the law), we will presume the federal law adjudication to be subsumed within the state law adjudication.").

In ruling that there was no violation of the Massachusetts discovery rule (which, per force, disposes of any *Brady* claim here), the SJC determined that the Lottery Commission, which held the underlying data, was not part of the prosecution team. The SJC noted that the JFI Report was "a third-party record, created by the Lottery Commission, that the Commonwealth did not possess until midtrial." *Kostka*, 489 Mass. at 412. Accordingly, the SJC held that the JFI report was not "within the prosecutor's 'possession, custody, or control'" and was not subject to discovery obligations under Rule 14(a). *Id.* (citing *Commonwealth v. Dwyer*, 448 Mass. 122, 139 & n.20 (2006)).

In a supplemental submission, Petitioner offers additional authority that arguably bears on the SJC's determination of who falls within the prosecution team. *See* Docket No. 17, at 1–2. Petitioner cites *Commonwealth v. Clemente*, in which the SJC noted that the constitutional obligation to disclose exculpatory evidence extends to persons "acting, in some capacity, as agents of the government in the investigation and prosecution of the case." 452 Mass. 295, 311 (2008) (citing *Commonwealth v. Beal*, 429 Mass. 530, 531 (1999)). The ruling in *Clemente*, however, does nothing to advance Petitioner's cause. In *Clemente*, a case involving a multi-victim shooting in Boston, the SJC considered a *Brady* claim that was based on nondisclosure of exculpatory evidence that had been obtained by various police agencies (including Massachusetts State Police and the DEA) that had not been involved in the investigation and prosecution of the shooting.

Petitioner acknowledges a portion of the holding in *Clemente*: that the Commonwealth was not obliged to obtain and turn over information held by a federal law enforcement agency, the DEA. *See* Docket No. 17, at 1–2. But Petitioner ignores that the exculpatory information addressed by the SJC in *Clemente* also included a report "prepared by agents of the State police." 452 Mass. at 311. The SJC ruled that the "material sought was not prepared by anyone within the control of the prosecution," and thus the failure to disclose the report prepared by the State Police was likewise not a *Brady* violation. *Id.* This aspect of *Clemente* forecloses any argument that the Lottery Commission, merely because it is a Massachusetts state agency, should have been deemed part of the prosecution team.

It seems obvious that the SJC, as the highest court in Massachusetts, was positioned to rule authoritatively on the relations among various agencies of Massachusetts government and on the application of Rule 14 to a situation in which evidence is obtained from an independent state

commission. These are plainly rulings by a state tribunal with respect to matters of state law, as the SJC's decision reflects. *See Kostka*, 489 Mass. at 411 (noting standard of review for discovery ruling "where objection is preserved and issue is not constitutional" (citing *Commonwealth v. Peno*, 485 Mass. 378, 399 (2020))). As such, this Court has no role in second-guessing these rulings. Even if there were some infirmity in the SJC's reasoning—and I detect none—it is well settled that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).

The only question for this Court is whether the SJC bungled a ruling on a matter of federal constitutional law, in contravention of rulings by the United States Supreme Court. Of that there is no hint.

###    B.        *The Prosecutor's Closing Argument*

Petitioner contends that the prosecutor's closing included "improper arguments [that] were so egregious as to render [Petitioner's] trial fundamentally unfair in violation of his right to due process." Docket No. 13, at 30 (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643–45 (1974)).

As quoted above, the prosecutor responded in his closing to the defense's contention that discrepancies in the VIRNs rendered the lottery ticket evidence unreliable. The specific remark at issue is as follows:

> [A]sk yourselves whether truly the numbers don't match or whether there was some gamesmanship in the numbers playing by the defense, because what you know through the testimony of Mr. Carroll is that the reason those VIRN's don't match up is because they are encrypted.

Docket No. 8-14, at 87:13–19.

Petitioner identifies two aspects of this closing argument as improper: the reference to Mr. Carroll's encryption testimony and the use of the term gamesmanship. *See* Docket No. 13, at

28–30. As to the first point, Petitioner notes that the prosecutor cited and relied upon the testimony of Mr. Carroll, who had told the jury that the discrepancies in the VIRNs were the result of routine encryption of lottery records. Petitioner contends that this testimony was inadmissible hearsay and, on this basis, he argues that the prosecutor's recounting of such evidence in closing argument was fundamentally unfair. *Id.* at 28–29. As to the second point, Petitioner takes issue with the prosecutor's choice of words, contending that use of the word "gamesmanship" ran afoul of constitutional prohibitions on disparagement of defense counsel. *Id.* at 29–30.

    *1.    Habeas Review of Claims Regarding Improper Prosecutorial Arguments*

As explained above, on habeas review, the Court must consider whether the SJC's decision runs contrary to federal law as clearly established by the United States Supreme Court. We begin, therefore, with the relevant federal standard for considering constitutional claims regarding prosecutorial argument. Here, the First Circuit has laid the groundwork:

> The clearly established law of the Supreme Court for evaluating the import of improper statements by prosecutors and the fairness of a trial is undisputed: a new trial is warranted if improper statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)); *see, e.g., Dorisca v. Marchilli*, 941 F.3d 12, 23 (1st Cir. 2019) (citing *Darden* as the clearly established law for purposes of deciding an AEDPA petition).

*Taylor v. Medeiros*, 983 F.3d 566, 572 (1st Cir. 2020).

While habeas relief may sometimes be granted based on improper argument, the Supreme Court has emphasized that "the standard [set out in *Darden v. Wainwright*] is a very general one." *Parker v. Matthews*, 567 U.S. 37, 48 (2012). And the Supreme Court has emphasized that "'the more general the [federal] rule[,] . . . the more leeway [state] courts have in reaching outcomes in case-by-case determinations' before their decisions can be fairly labeled

unreasonable." *Davenport*, 596 U.S. at 144 (alterations in original) (quoting *Renico v. Lett*, 559 U.S. 766, 776 (2010)). Accordingly, Petitioner's challenge concerning the prosecutor's closing remarks must surmount a high bar.

2.    *The Investigator's Testimony about Encryption*

Petitioner characterizes Mr. Carroll's testimony about encryption as "rank hearsay" (Docket No. 13, at 28), but notably he does not advance any argument that the admission of that testimony violated any constitutional right. The rules regarding admissibility of hearsay in Massachusetts courts are quintessentially matters of state evidence law.[11] The SJC analyzed the hearsay issue at some length and concluded that it was error to admit Mr. Carroll's testimony recounting what his "computer people" told him about encryption.[12] The SJC concluded, however, that the "the error did not create a substantial likelihood of a miscarriage of justice." *Kostka*, 489 Mass. at 418–19. Because this ruling does not touch on a matter of federal constitutional law, it is beyond the purview of this Court's habeas review. As the Supreme Court has noted, in "conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68; *see also Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002) ("[A]ssuming that the prosecutor did violate [an Ohio state discovery rule], such a claim is not cognizable on habeas, because it is not a constitutional violation.").

---

[11] Although testimonial hearsay implicates the Confrontation Clause, state law generally governs the law of evidence. *See generally Crawford v. Washington*, 541 U.S. 36, 68 (2004) ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . .").

[12] Mr. Carroll's statement was elicited by defense counsel on cross-examination and was met with no objection or request to strike. *See Kostka*, 489 Mass. at 415–17. Nevertheless, the SJC concluded that the claim of error was preserved because the trial judge had allowed a continuing objection. *Id*. at 416.

3.    *The SJC Reasonably Found No Misconduct in the Prosecutor's Reference to Testimony about "Encryption"*

In an effort to bootstrap a garden-variety hearsay objection into a cognizable claim of improper argument, Petitioner intimates that the prosecutor's argument somehow amounted to a misstatement of the evidence. *See* Docket No. 13, at 29. It is, of course, well-settled, as the SJC noted it its decision, that prosecutors may not 'misstate the evidence or refer to facts not in evidence.'" *Kostka*, 489 Mass. at 417 (quoting *Commonwealth v. Imbert*, 479 Mass. 575, 585 (2018)).

Petitioner proceeds in this argument by noting that while Mr. Carroll "testified that he was told . . . that the numbers . . . are encrypted for security purposes, no one from the manufacturer confirmed that fact." Docket No. 13, at 29. Petitioner then contends that, based on the absence of confirmation by the manufacturer, the prosecutor's affirmation of Mr. Carroll's testimony "improperly characterize[ed] a speculative assertion as a conclusively established fact." *Id.* Apart from the absence of confirmation, however, Petitioner points to nothing in the record to indicate that Mr. Carroll's testimony was inaccurate. Nor does Petitioner claim that the prosecutor distorted Mr. Carroll's words.

The record does not support Petitioner's characterization of the evidence or the prosecutor's argument. Mr. Carroll answered defense counsel's questions without reservation. *See* Docket No. 8-11, at 195:11–16 ("[W]hat was explained to me by our computer people was that for security purposes, the actual VIRN numbers that you saw on these two different reports were encrypted with different numbers for security purposes."). There is no indication that the investigator was offering any personal conjecture or speculation. On the contrary, Mr. Carroll

recounted what others had told him. Doubtless this was hearsay (albeit hearsay that was elicited by the defense, with no request to strike).[13] But it cannot fairly be called speculation.

Given that the prosecutor's remark about encryption was explicitly based on testimony that had been admitted in evidence, the SJC concluded that there was no prosecutorial error:

> When the testimony about encryption was introduced, the defendant did not move to strike it and did not request a limiting instruction. Accordingly, the testimony was admitted for all purposes, and the prosecutor therefore did not err in referring to it as substantive evidence.

*Kostka*, 489 Mass. at 417–18.

Defendant does not directly challenge this ruling by the SJC. Still less does he point to any decision of the Supreme Court that conflicts with the SJC's ruling. This disposes of any habeas claim on this score.

### 4. The SJC Reasonably Found that the Prosecutor's Characterization of Defense Theory as "Gamesmanship" Was Proper

Petitioner contends that the prosecutor's "gamesmanship" comment regarding the defense argument about the VIRNs "improperly disparaged the defense by arguing that counsel was attempting to mislead them." Docket No. 13, at 29–30. To support this claim, Petitioner seeks to draw comparisons with various decisions in which courts have condemned a variety of prosecutorial comments on the defense function. To that end, Petitioner cites six decisions by

---

[13] It was for the SJC to determine that the admission of Mr. Carroll's statement was error under state evidence law. I note, however, that the cold transcript leaves open the possibility that defense counsel simply assented to the introduction of that bit of hearsay. It is entirely possible that defense counsel, in trying to maximize the impact of his showing that the VIRNs in the different lottery documents did not match, asked the proverbial "one question too many" during cross-examination, eliciting Mr. Carroll's explanation about "encryption." Having received this decidedly unfavorable answer, defense counsel may simply have chosen to leave well enough alone. Indeed, moving to strike the answer might have spurred the prosecution to resolve the VIRN issue by introducing more damning evidence; the trial judge had already invited additional witness testimony regarding the lottery tickets. *See Kostka*, 489 Mass. at 412 n.8.

various federal courts of appeals, only one of them a habeas case,[14] which identify particular instances of prosecutorial invective as improper. *Id.* at 29–31. None of the prosecutorial comments that were condemned in these cases seems particularly similar to the "gamesmanship" remark at issue here.[15]

Petitioner also cites two Supreme Court cases, *Donnelly v. DeChristoforo* and *United States v. Young*, 470 U.S. 1 (1985), neither of which helps his cause. *DeChristoforo* is most notable for its holding that even improper prosecutorial argument does not generally warrant habeas relief. *See* 416 U.S. at 647–48 (noting "the distinction between ordinary trial error of a prosecutor and that sort of egregious misconduct held . . . to amount to a denial of constitutional due process"). *Young* is a direct review case involving the federal court's exercise of its supervisory powers. The decision in *Young* does not even touch upon constitutional due process rights, although it does support the anodyne proposition that "[counsel] must not be permitted to make unfounded and inflammatory attacks on the opposing advocate." 470 U.S. at 9.

---

[14] Given that all but one of the cited cases involved direct appeals, those courts were in a position to exercise plenary supervisory authority in policing the behavior of prosecutors in the federal court.

[15] *See, e.g.*, *United States v. Biasucci*, 786 F.2d 504, 514 n.9 (2d Cir. 1986) (denying new trial where prosecutor referred to defense counsel as a "sleaze" and a "hypocritical son - - -"); *United States v. Carter*, 236 F.3d 777, 785, 793 (6th Cir. 2001) (reversing conviction where prosecutor, in closing argument, asked the jury not to let defense counsel "sneak . . . one over on [them]" and described defense counsel's characterization of a witness's testimony as "one tremendous colossal lie"); *Caldwell v. Russell*, 181 F.3d 731, 737, 740 (6th Cir. 1999) (affirming denial of habeas petition where "prosecutorial remarks in controversy were supported by the [admitted evidence]"); *United States v. Xiong*, 262 F.3d 672, 674–75 (7th Cir. 2001) (denying new trial where prosecutor stated: "What [counsel] is telling you, ladies and gentlemen, is that you should never convict somebody in this type of conspiracy" (alteration in original)); *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) (reversing conviction where prosecutor, in closing argument, asked the jury "not to credit that scam that has been perpetrated on you"); *United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir. 1987) (granting new trial where prosecutor "repeatedly accused [defense] counsel of intentionally misleading the jurors and witnesses and of lying in court").

Regardless of what appears in Petitioner's brief, the analysis in this habeas case must begin with the SJC's decision. The SJC reviewed in some detail various decisions in which the SJC has drawn the line between fair criticism of defense arguments and improper disparagement of defense counsel. *See Kostka*, 489 Mass. at 416. Measured by that benchmark, the SJC squarely held that the prosecutor's use of the term "gamesmanship" was in bounds:

> The prosecutor's use of the word "gamesmanship," however, could have emphasized to the jury that these apparently valid challenges to the numbers were what the judge described as a "red herring"[16]; while unique to each ticket, the VIRNs were randomly generated, and the VIRNs of the winning tickets were unknown. The game, book, and ticket numbers, which were sequential and which, in combination, were also unique, were the key that tied the redeemed winning tickets to the tickets found in the victim's home, with matching game and book numbers, and ticket numbers close in sequence to the redeemed tickets. Thus, this remark about gamesmanship itself was not improper.

*Id*. at 417.

Petitioner points to nothing in logic or precedent to indicate that the SJC's conclusion conflicts with any clearly established principle of federal law as enunciated by the Supreme Court. Indeed, the SJC's decision comports fully with the analysis employed by the First Circuit in *Taylor v. Medeiros*, which analyzed the application of clearly established federal constitutional law in the context of a habeas challenge to an SJC decision regarding improper prosecutorial argument. In *Taylor*, the First Circuit noted that—as in the matter at bar—the SJC had applied Massachusetts state precedents that broadly mirror the federal standards. *See* 983 F.3d at 573. Thus, the First Circuit concluded that the SJC's approach to evaluating a "prosecutorial misconduct claim under Massachusetts state law . . . . is consistent with *Darden*."

---

[16] It is not obvious that the prosecutor's term "gamesmanship" is meaningfully harsher than the trial court's own term, "red herring." Both appear to be fair descriptors.

*Id.* (citing *Dagley v. Russo*, 540 F. 3d 8, 17 (1st Cir. 2008)). The same observation seems apt in this case.[17]

Usefully for present purposes, the First Circuit in *Taylor* addressed a variety of prosecutorial comments, some blatantly improper, others innocuous. In particular, the *Taylor* court identified an example of prosecutorial disparagement that was fairly deemed "ill-advised" and "inappropriate" (*see id.* at 573–74), as well as several examples of hard-hitting responses to defense arguments that were "within [the] leeway" afforded to a prosecutor at closing (*see id.* at 574–75). In so doing, the court noted that the SJC's rulings on these various comments were "a reasonable application of clearly established federal law as determined by the Supreme Court." *Id.* at 575 (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

Side-by-side comparisons are sometimes tricky, but in this case the contrasts are stark. There is a palpable difference between the "gamesmanship" comment at issue in this case and the comment that was identified as improper in *Taylor*, to wit, calling the defense argument a "bald-face lie." *Id.* at 573–74. On the other side of the coin, the "gamesmanship" comment seems milder, and certainly no more inflammatory, than the comments that were deemed proper in *Taylor*. These included "a characterization of the defense's theory as 'fantastic' and 'outlandish[,]'" and "a description of the defense's theory as a 'path of speculation, of cynicism, and innuendo.'" *Id.* at 574. Indeed, while the court in *Taylor* plainly disapproved of the prosecutor's harsh characterization of a particular cross-examination as "rude," "disrespectful," and "vulgar," the First Circuit nonetheless found that the SJC had reasonably concluded,

---

[17] Petitioner's brief fails to even address the relationship between clearly established federal constitutional law and the Massachusetts cases cited in the SJC's decision.

"*consistent with clearly established Supreme Court law*," that those remarks were "not an improper personal attack on defense counsel." *Id.* at 575 (emphasis added).

In short, nothing in the SJC's findings regarding the prosecutor's comments is contrary to clearly established Supreme Court authority. This is fatal to any habeas claim.

<u>CONCLUSION</u>

For the reasons set forth above, I RECOMMEND that the habeas petition [Docket No. 1] be DENIED.[18]

Dated: August 20, 2024              /s/ Paul G. Levenson
                                    Paul G. Levenson
                                    U.S. MAGISTRATE JUDGE

---

[18] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).